## STATE v. TOPHAM.

No. 2340.   Decided May 4, 1912 (123 Pac. 888).

1. INDICTMENT AND INFORMATION—CERTAINTY.   To withstand either a motion in arrest or a demurrer, the indictment must inform accused of the crime charged with such reasonable certainty that a judgment thereon will be a defense to a second prosecution for the same offense.   (Page 42.)

2. CRIMINAL LAW—APPEAL—PRESUMPTIONS.   Since every man is presumed to be innocent until proved guilty, he is also presumed to be ignorant of what is intended to be proved against him, except as informed thereof by the indictment.[1]   (Page 42.)

3. INDICTMENT AND INFORMATION—LANGUAGE OF STATUTE—PANDERING.   Sess. Laws 1911, chap. 108, makes any person who "shall by promises, threats, violence, or by any device or scheme, cause, induce, persuade, encourage, inveigle, or entice an inmate of a house of prostitution" to remain therein as an inmate, guilty of pandering.   Comp. Laws 1907, sec. 4730, requires the information to contain a statement of the acts constituting the offense in ordinary and concise language so as to enable a person of common understanding to know what is intended.   The information charged that accused did willfully, unlawfully, etc., "by promises, threats, and by divers devices and schemes, cause, induce, persuade, and encourage" the woman named, "being then and there an inmate of a certain house of prostitution, to remain therein as such inmate," describing and locating the house.   *Held*, that the information was insufficient on demurrer and motion in arrest for not alleging the facts and circumstances constituting the promises, devices, etc., by which the female was induced to remain in the house of prostitution.   (Page 43.)

---

[1] State v. McKenna, 24 Utah, 317, 67 Pac. 815.

4. Indictment and Information—Statutory Offenses—Sufficiency. In order that an information charging a statutory offense may be sufficient by following the language of the statute, it must fully, directly, and expressly contain all the elements constituting the offense, and, if not sufficient to do so, the statutory language must be expanded in the information.[2] (Page 43.)

5. Indictment and Information—Sufficiency. Essential elements of the offense not included in the information cannot be supplied by the evidence. (Page 54.)

6. Indictment and Information—Nature of "Pleading." "Pleadings" are the juridical means of investing the court with jurisdiction of a subject-matter to adjudicate thereon. (Page 54.)

7. Prostitution—Elements of Offense—Pandering. Under Sess. Laws 1911, chap. 108, making a person who shall by promises, etc., cause or induce an inmate of a house of prostitution to remain therein guilty of pandering, the promises must have been made with the purpose of causing or inducing the inmate to remain, and must have actually tended to cause such result, and the inmate must have been induced thereby to remain in the house, and the fact that accused told the inmate that, if the inmate's mother was willing to let her stay there, accused would fit the inmate out with nice clothes and send her to another house of prostitution run by accused did not show a promise by accused, within the statute. (Page 59.)

8. Prostitution—Sufficiency of Evidence. Evidence in a prosecution for pandering contrary to the statute *held* not to show a promise by accused whereby an inmate of a house of prostitution was induced to remain therein. (Page 62.)

9. Indictment and Information—Amendment—Right. An amendment to an information for pandering, charging accused with having induced a female to remain an inmate of a house of prostitution by promises and divers devices unnamed, so as to allege the promises made and devices used to induce her to remain, was as to a matter of substance and could not be made after judgment, so that, upon determining that the information was insufficient, accused must be discharged, under Comp. Laws 1907, sec. 4694, permitting an information to be amended at any time after defendant pleads, and on trial as to all matters of form at the court's discretion, where it can be done without prejudice to accused. (Page 63.)

---

[2] State v. Swan, 31 Utah, 336, 88 Pac. 12; State v. Williamson, 22 Utah, 248, 62 Pac. 1022, 83 Am. St. Rep. 780; State v. Evans, 27 Utah, 12, 73 Pac. 1047.

APPEAL from District Court, Third District; *Hon. F. C. Loofbourow,* Judge.

Dora B. Topham was convicted of pandering. She appeals.

REVERSED AND REMANDED WITH DIRECTIONS TO DISCHARGE ACCUSED.

*E. A. Rogers* and *Powers & Marioneaux* for appellant.

*A. R. Barnes,* Attorney-General, and *E. V. Higgins,* and *Geo. C. Buckle,* Assistant Attorneys-General, for the State.

STRAUP, J.

The defendant was convicted of the crime of pandering, and was sentenced to imprisonment in the state prison for a term of eighteen years. She appeals.

The portion of the statute (Sess. Laws 1911, chap. 108) under which she was charged and convicted reads: "Any person who shall, by promises, threats, violence, or by any device or scheme, cause, induce, persuade, encourage, inveigle, or entice an inmate of a house of prostitution or place of assignation to remain therein as such inmate," is guilty of the crime of pandering and punishable by imprisonment in the state prison for a term of not more than twenty years. The information charged that the defendant on, etc., at, etc., "did then and there willfully, unlawfully, and feloniously, by promises and threats, and by divers devices and schemes, cause, induce, persuade and encourage" a particularly named female, "being then and there an inmate of a certain house of prostitution, to remain therein as such inmate; such house of prostitution being then and there known as No. 140 in what is commonly known as the stockade in Salt Lake City." To this information the defendant, before plea, interposed a general and a special demurrer alleging that the information did not state facts sufficient to constitute an offense, and especially did not sufficiently set forth the nature and cause of the accusation, nor the acts constituting the offense, nor

the particular circumstances of the offense necessary to constitute a complete offense. The demurrers were overruled. After verdict, and before sentence, the defendant on the same grounds also made a motion in arrest of judgment, which motion was also denied. These rulings and those relating to insufficiency of evidence to support the verdict are complained of.

The doctrine is fundamental, and, as stated by the Supreme Court of the United States in *Rosen v. United States,* 161 U. S. 29, 16 Sup. Ct. 434, 40 L. Ed. 606, that "the constitutional right of a defendant to be informed of the nature and cause of the accusation against him entitles him to insist, at the outset, by demurrer or by motion to quash, and after verdict, by motion in arrest of judgment, that the indictment shall apprise him of the crime charged with such reasonable certainty that he can make his defense and protect himself after judgment against another prosecution for the same offense;" and by Mr. Justice Sanborn in *Floren v. United States,* 186 Fed. 961, 108 C. C. A. 577, that:

"On a motion in arrest of judgment, as well as on a demurrer, it is essential to the validity of an indictment that it contain averments of the facts which constitute the offense it charges so certain and specific that upon conviction or acquittal thereon it, and the judgment upon it, will constitute a complete defense to a second prosecution of the defendant for the same offense."

Many cases in support of this doctrine are there cited.

It is also elementary and, as stated by the Michigan court in *People v. Marion,* 28 Mich. 257, approved and quoted by this court in *State v. McKenna,* 24 Utah, 317, 67 Pac. 815, that, "as every man is presumed to be innocent until proved to be guilty, he must be presumed also to be ignorant of what is intended to be proved against him, except as he is informed by the indictment or information."

These doctrines are not here disputed. Our statute is in harmony with them. Comp. Laws 1907, section 4730, provides that "the information or indictment must contain

. . . a statement of the acts constituting the offense, in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended;" and by section 4732 that "the information or indictment must be direct and certain as it regards . . . the offense charged," and "the particular circumstances, when they are necessary to constitute a complete offense." Here, then, we have a statute which in all cases requires the information to contain "a statement of the acts constituting the offense," and to be "direct and certain as it regards the offense charged, and the particular circumstances of the offense, when they are necessary to constitute a complete offense."

Does the information meet these requirements? If it does, it is good; if not, it is bad and will not support the judgment. The material parts of the information in this respect are that the defendant did "by promises and threats, and by divers devices and schemes, cause, induce, persuade, and encourage" an inmate of a house of prostitution to remain therein as such inmate. The offense is charged in the mere language of the statute. That, the state urges, is sufficient. But that is not what the statute declares.

Of course there are cases where an indictment or information in the language of the statute is good. But there are many where that is not true. Says Mr. Bishop in 1 New Criminal Procedure, section 624: "The indictment must fully state the offense; and, if the statutory words do not suffice for this, it must be expanded beyond them." Said the Supreme Court of the United States in *United States v. Cruikshank,* 92 U. S. 542, 23 L. Ed. 588:

"It is an elementary principle of criminal pleading that where the definition of an offense, whether it be at common law or by statute, includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition, but it must state the species—it must descend to particulars."

The same thought is expressed by Mr. Justice Frick in the case of *State v. Swan,* 31 Utah, 336, 88 Pac. 12, that,

"Where an act denounced by the statute is couched in generic terms, the information must go further in stating the offense than by merely using the language of the statute," and that an information in such language is not sufficient "in those cases where the acts constituting the offense are nearly as varied as the number of cases in which the charge is made."

In order that an information merely in the words of the statute may be sufficient, the words of the statute themselves "must fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished, and must state all the material facts and circumstances embraced in the definition of the offense." (22 Cyc. 340; *Evans v. United States,* 153 U. S. 587, 14 Sup. Ct. 934, 38 L. Ed. 830; *United States v. Carll,* 105 U. S. 611, 26 L. Ed. 1135.)

The Supreme Court of California well expressed the rule in *People v. Perales,* 141 Cal. 581, 75 Pac. 170, in the following language:

"While it is the general rule that it is sufficient to charge an offense in the language of the statute, yet this rule is subject to the qualification that, where a more particular statement of facts is necessary in order to charge the offense definitely and certainly, it must be made. The statute may, and often does, define the offense by the use of precise and technical words which have a well-recognized meaning or designates and specifies particular acts or means whereby an offense may be committed. Under such circumstances, to charge the offense substantially in the language of the statute will be sufficient. When, however, the words or terms used in the statute have no technical or precise meaning, which of themselves imply the offense, or where the particular facts or acts which shall constitute it are not specified, but, from the general language used, many things may be done which may constitute an offense, it is then necessary, in charging an offense claimed to be embraced within the general language of the statute, to set forth the particular things or acts charged to have been done with reasonable certainty and distinctness, so that the court may determine whether an offense within the statute is charged or one over which it has jurisdiction, and so that the defendant may be advised of the particular nature of it in order to defend against it, and to plead in bar a judgment of conviction or acquittal thereof, if subsequently prosecuted." -

Said the court in *Commonwealth v. Milby* (Ky.), 24 S. W. 625:

"The language of the statute cannot always be followed in punishments for offenses of either a criminal or a penal nature, Enough must be stated to enable the defendant to know in what particular he has violated the statute."

And in *State v. Frazier,* 53 Kan. 87, 36 Pac. 58, 42 Am. St. Rep. 274:

'The physical acts done towards the commission of the offense should be stated in the information or indictment, so that the court may see whether or not the law has been violated, and so that the accused may know to what he must make answer."

To the same effect is *Thompson v. People,* 96 Ill. 161, and are also many other cases.

What are here the essentials of the charged offense? The state urges to cause, induce, and encourage an inmate of a house of prostitution to remain therein as such inmate. That is one essential; but it is not all the essentials declared by the statute. It declares that "any person who shall, by promises, threats, violence, or by any device or scheme," cause, induce, etc., an inmate of such a house to remain therein, is guilty of an offense. The act or conduct of the person who shall, by a promise or threat or violence, or by a device or scheme, cause, induce, or encourage, etc., is a necessary "act constituting the offense," and is a "particular circumstance of the offense to constitute a complete offense." Without it no offense under the statute is committed. That is manifest from a reading of the statute. And so did the pleader conclude, for the information charges, not that the defendant caused and induced, etc., an inmate of a house of prostitution to remain therein, but that the defendant did, "by promises and threats and by divers devices and schemes, cause, induce," etc., such a person to remain in such a house as an inmate. The statute thus making such acts and conduct of a promise or threat or violence, or by a device or scheme, necessary acts constituting the offense, and requiring "the particular circumstances necessary to constitute a complete offense" to be stated, were

they here set forth in the information with reasonable certainty and distinctness, so that the court, in the language of the California and other courts, could determine whether an offense within the statute had been charged, and so that the defendant could be advised of the particular nature of it in order to defend against it and plead in bar a judgment of conviction or acquittal thereof if subsequently prosecuted? In other words, were the acts and particular circumstances of the offense set forth with such reasonable certainty and in ordinary and concise language and in such manner as to enable a person of common understanding to know what particular acts or conduct were complained of, what physical acts would be claimed the accused had committed, what things said or done by her, or of what particular conduct she was guilty, and which were intended to be proved against her? Should one assert to another that he had a "device or scheme" to accomplish a particular result, would that "in ordinary and concise language enable a person of ordinary understanding to know what was intended" or meant? To enable such a person to know what was intended, would not the first question necessarily be, "What is the device or scheme?"

When the defendant was charged that she had "by divers devices and schemes" accomplished a particular result, who but the pleader knew what was intended or expected to be proved against her in such respect? Or, if it should be claimed that she by "threats" had accomplished such result, again, who but the pleader could know with reasonable certainty what menacing act or conduct of hurt or fear, or threatening menace to inflict pain or punishment or injury to person, reputation, or property, or to restrain freedom of action, was intended or expected to be proved? Should one complain of another that he "threatened" him, would not again the first question necessarily be, in order to "enable a person of common understanding to know" what was meant or intended, "What did he say or do?" And, if it should be claimed that the defendant by "promises" had accomplished such result, again, could any one but the pleader know with

reasonable certainty just what particular acts or conduct in that regard was intended or expected to be proved? This information may be looked at with the utmost liberality, and yet what facts or circumstances or acts are there set forth from which the court may determine whether a promise or promises in law were made by the defendant, if it should be claimed that she, by such means, accomplished the charged result, or a threat made or device or scheme used or employed, if by either of these it be claimed the defendant accomplished such result? Neither she nor any one else except the pleader could know whether he intended to prove some kind of a promise or a threat or a device or scheme. Under the information, if it is good, the state would be permitted to prove anything which the prosecution thought tended to show a promise, anything a threat, anything a device, anything a scheme, and no objection to the offer of any such evidence could properly be made by the defendant. If that be true, then the state might as well be permitted in an information to generally charge the defendant "with having committed the offense of pandering" and be allowed to prove anything tending to show the commission of such an offense.

Under this information, neither the court nor the defendant, until the evidence was adduced, could know what particular acts or conduct would be claimed had been committed by the defendant, and, until then, the court could not know whether an offense had been charged, nor the defendant what she was called upon to meet and answer. As the accused "must be presumed ignorant of what is intended to be proved against him except as he is informed by the information or indictment," it is essential that the information or indictment, not the evidence, apprise him with reasonable certainty what is intended or expected to be proved, and what he is required to meet and defend. And, as repeatedly stated by the courts, the acts constituting the offense, and the particular circumstances of the offense, when they are necessary to constitute a complete offense, are required to be stated in the information, so that the court may determine whether the acts and conduct complained of constitute a violation of the

statute. It surely cannot be contended that the determination of such a question is alone for the jury, and that it is at liberty to regard anything a promise, anything a threat, anything a device, anything a scheme. Should one either in a civil or criminal pleading charge another at a specified time and place "with having cheated and defrauded" him, without alleging the acts, the conduct, the facts constituting the cheat or fraud, certainly no one would contend that to be a sufficient pleading to withstand a demurrer. What more has been done here? The pleader has stated his conclusion that the defendant has said or done something, that she has been guilty of some kind of conduct, or committed acts of some kind, which in his opinion amount to a promise or a threat or a device or a scheme, but withheld from the court and the defendant a statement of any acts committed, or things said or done, by her, or any facts or circumstances from which it may be determined whether in law a promise or threat was made, or a device or scheme used or employed, by her. The acts and conduct of the defendant, and the facts and circumstances constituting the promise, the threat, the device, the scheme, were required to be alleged in the information, so that the court could judge whether the accused should have been put upon trial, and that she might then know what she was to defend against. (*Turnipseed v. State,* 6 Ala. 664.) The allegations here do not meet such requirements. In addition to the authorities already referred to holding such an information as this insufficient, we also refer to *United States v. Hess,* 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516; *United States v. Post* (D. C.), 113 Fed. 852; *Stewart v. United States,* 119 Fed. 89, 55 C. C. A. 641; *Dalton v. United States,* 127 Fed. 544, 62 C. C. A. 238; *People v. Neil,* 91 Cal. 465, 27 Pac. 763; *State v. Farmer,* 104 N. C. 887, 10 S. E. 563; *Bowles v. State,* 13 Ind. 427; *State v. Bennett,* 102 Mo. 356, 14 S. W. 865, 10 L. R. A. 717; Id. (Mo.), 11 S. W. 264.

In *United States v. Hess, supra,* and in the federal cases just cited, it was held that an indictment based on and in the language of the statute directed against "devising or intend-

ing to devise any scheme or artifice to defraud," to be effected by communication through the post office, must not only allege that the person did devise a scheme or artifice to defraud, but it must set out clearly and distinctly what that artifice was, wherein the fraud consisted, the facts and circumstances by which it was to be accomplished, the facts which constitute the specific scheme or artifice so devised by the defendant, and that this must be done, not inferentially, but by direct and positive averments.

In *People v. Neil, supra,* it was held that an information charging that the defendant "fraudulently voted at an election when he was not entitled to vote," though in the language of the statute, is not sufficient to state an offense, but must set forth the facts relied on to show fraudulent voting and the particular fact or facts showing that the defendant was not entitled to vote.

In *State v. Farmer, supra,* it was held that an indictment against a physician, in the language of the statute, for giving a false and fraudulent prescription for liquors, must set out not only that the prescription was either false or fraudulent, but also the facts and particulars constituting the falsity or fraud.

In *State v. Bennett, supra,* an information charging in the language of the statute that the accused "did enter upon and exercise and continue the exercise and practice of a business, avocation, or profession of a private detective," without stating facts to show in what way he acted as such, was held fatally defective.

The insufficiency of the information is thus shown by numerous authorities. We have been referred to no case which in our judgment supports the information. The Attorney-General has referred us to a number of cases, but upon a careful examination of them it will be found that they lend but little support to his contention. He starts with the proposition that "it is the universal rule that statutory offenses should be alleged in the words of the statute." But that, under all the authorities, is stating the rule much too broadly. The rule is this, and as we have already indicated,

41 Utah—4

especially by the cases of *People v. Perales* and *State v. Swan,* where the statute creating the offense defines it by the use of precise words and designates and specifies particular acts or means whereby the offense may be committed, it is sufficient to charge the offense in the language of the statute; but where the particular facts or acts which constitute it are not specified, and from the general language used in the statute many things may be done which may constitute the offense, it is then necessary, in charging an offense claimed to be embraced within the general language of the statute, to set forth the particular things or acts charged to have been done with reasonable certainty and distinctness, so that the court may determine whether an offense within the statute is charged.

The Attorney-General refers us to *State v. Williamson,* 22 Utah, 248, 62 Pac. 1022, 83 Am. St. Rep. 780, and to *State v. Evans,* 27 Utah, 12, 73 Pac. 1047, where informations in the language of the statute were held good. But in those cases the offense charged was, in the one having carnal knowledge, and in the other attempting to have carnal knowledge, of the body of a female under eighteen years of age. The statute there specified the particular act declared to be the offense—having carnal knowledge of the body of a female. The information which charged that the accused "had carnal knowledge of the body" of a woman described the particular act or conduct of which complaint was made. No language, however artful or replete with literary foliage, could describe that act or conduct more precisely or certainly. It describes not many or divers acts or things, but one particular, precise, and definite act. Contrast that with this information: "Did, by promises, threats, and divers devices and schemes, induce," etc.—generic terms broad enough to embrace almost innumerable species and particulars, and about every conceivable thing which may be called a promise, a threat, or a device or scheme. Under it, not only one or several precise or definite, but many and divers, acts and things are embraced. Let the language of the court in *United States v. Cruikshank, supra,* again be noticed:

"Where the definition of an offense, whether it be at common law or by statute, includes generic terms, it is not sufficient that the indictment should charge the offense in the same generic terms as in the definition; but it must state the species—it must descend to particulars."

This principle was recognized in the cited case of *State v. Evans,* for the court there well observed:

"This is not a case where the accused, under such an information, may be taken by surprise, as in case of a crime which may be committed in several different ways or with various means, and therefore the reason of the rule which requires the overt act or acts by which a crime was committed to be pleaded does not apply, and hence the rule itself ought not to be enforced."

The court could have gone further by saying that the "overt act" was particularly described by the use of the words "carnal knowledge;" they having such a precise and well-recognized meaning as to enable a person of common understanding to know just what is intended.

We are also referred to the case of *State v. Bauguess,* 106 Iowa, 107, 76 N. W. 508. But in that case the same principle was also recognized. The court said:

"It has been repeatedly held that an indictment is sufficient if it charges the offense in the language of the statute, when that shows the material facts which constitute the offense."

There the accused was charged in the language of the statute with having made "an indecent exposure of the person." The court properly held the indictment good, for, as there stated by the court, the offense was both named and particularly described, the phrase "indecent exposure of the person" having a well-settled and commonly accepted significa-tion and meaning the exhibition of such parts of the person as modesty or a sense of self-respect requires to be kept usually covered. The court well distinguished that case from a prior decision of the same court (*State v. Butcher,* 79 Iowa, 111, 44 N. W. 239), where it was held that an information in the language of the statute charging the accused with hav-ing "willfully and unlawfully interrupted and disturbed a

public school" was fatally defective for "the acts constitut-
ing the offense should be set out in the information in order
that it might appear whether they amounted to a crime."

The Attorney-General strongly relies on the case of *State
v. Porter,* 105 Iowa, 677, 75 N. W. 519, seemingly, not so
much on the exact point decided as on particular language
there employed. In that case the indictment charged that
the accused suborned and procured a witness in a certain
cause to falsely testify to certain facts specifically set forth
in the information. The insufficiency of the indictment was
urged on the ground that it failed to state the means and
methods by which the accused suborned the witness and pro-
cured him to falsely testify to the alleged facts. The court,
in holding the indictment good, well observed that "if the
defendant induced" the witness "to testify falsely, and did so
knowingly, it is quite immaterial what means he used,
whether in themselves illegal or not. The crime does not
inhere in the method or means, but in the result—the pro-
curement." This language is pointed to and sought to be
applied thus: That the gravamen of the charged offense
here is to "cause, induce, persuade, or encourage" an inmate
of a house of prostitution to remain therein, and that the
means or method employed to accomplish such result are im-
material and unessential. That leads to the conclusion that
the means and method employed to accomplish the
charged result need not be and were unnecessarily alleged, and
that an information charging that the accused caused, in-
duced, persuaded, and encouraged an inmate of a house of
prostitution to remain therein would be a good information.
But a glance at the statute shows such a position wholly un-
tenable. As already observed, the language of the statute
here is not that "any person who shall cause, induce," etc.,
an inmate of a house of prostitution to remain therein is
guilty of an offense, but that "any person who shall by
promises, threats, violence, or by any device or scheme cause,"
etc., an inmate to remain in such house is guilty of an
offense. In the Iowa case the means and method of procur-
ing the false testimony to be given were not by statute made

essential parts of the offense. Here the means and method employed by which an inmate of a house of prostitution is caused or induced to remain therein are expressly made essential parts of the offense. Unless one or more of the means or methods so stated by the statute are employed, no offense is committed.

The case of *State v. George,* 93 N. C. 567, is also cited. The indictment there charged that the defendant, at a specified time and place, willfully and unlawfully "did abduct" a child under fourteen years of age from the custody of her father, and induced her to leave him, etc. The court very properly held the indictment not bad because it failed to allege the means by which the abduction was effected. Again the court observed that the term "abduction" has a well-known signification and means "the taking and carrying away of a child," etc., and that "when a statute makes the particular act an offense, and sufficiently describes it, by terms having a definite and specific meaning, without specifying the means of doing the act, it is enough to charge the act itself, without its attendant circumstances." But here the statute does describe the means of doing the act, not in terms having a definite or specific meaning, but in generic terms having a general, comprehensive, and a varied meaning, and under which many things may be done which may constitute the offense.

We do not deem it necessary to further review cases. We have reviewed those apparently most relied on by the state, and have carefully considered all cited by it. We do not think any of them support its contention. To the contrary, the authorities, with substantial unanimity, hold such an information as this, under similar statutes as here, fatally defective; and such, in effect, has been the holding of this court since its organization.

A further rather ingenious argument is made by the state that, when the evidence is looked to, it will be seen that "the prosecution did not attempt to show at the trial any threats, devices, or schemes, but did show, as we contend, certain

promises by which the inmate of a house of prostitution was induced and persuaded to remain therein as such inmate."

Firstly, an information wanting in essentials cannot be helped or aided by evidence, and its sufficiency in such regard cannot be determined by what the state proved or failed to prove. If anything is established and set at rest in the law, it is that defects in substance of an information or indictment are not cured by evidence or verdict. And so does our statute expressly provide, for it permits, after verdict, a motion in arrest of judgment founded on defects of the information or indictment in failing to substantially conform **5, 6** to the requirements of Comp. Laws 1907, sections 4730 and 4732, heretofore referred to. That must necessarily be true, for it is an orient peak in the law that pleadings are the juridical means of investing a court with jurisdiction of a subject-matter to adjudicate it, and, for *res adjudicata,* that matter must be described with reasonable certainty and particularity. Secondly, following the argument of the Attorney-General, how did the defendant know by the information that the state would only attempt to prove "certain promises?" Under the information, if it is good, the state was equally entitled to prove any kind of a threat, or a device, or a scheme. In that respect the defendant was left in the dark by the information until the evidence was adduced; and thus the evidence, and not the information, apprised her what was intended to be proved against her and what she was required to meet and defend. But what were "the certain promises" which she by the information ought to have known were intended to be proved against her? Promises of employment or of remuneration, investment, gift, forbearance, or to do or not to do one or more of almost innumerable and inconceivable things? Who, by the information, could know until the evidence was adduced? When in a pleading it is alleged that one promised employment or reward or compensation, or to pay money, or to give something, or to do or not to do one or several particular things, something has been described with at least some degree of certainty or understanding. But what matter or

thing is here so described by the information which, by the use of the generic and variant term "promises," embraced a hundred or more indefinite and uncertain things, all equally described by it?

Furthermore, much of the evidence relating to the question in hand—the certain promises, the only thing which the state claims was attempted to be proved—is as vague and uncertain as the information itself. It is shown that in Salt Lake City there was maintained a "stockade," an inclosed cluster of houses of prostitution. The houses were occupied and the business of prostitution conducted therein by different so-called "landladies" who received and employed their own inmates and prostitutes. The buildings were owned by an investment company of which the defendant was a stockholder and in which she was interested. She rented them to different landladies, collected the rents, maintained an office in the stockade, and was a sort of supervisor or director of the stockade. She had nothing to do with procuring or employing the inmates. So far as disclosed by the evidence, she exercised no control or direction over them except the inmates were required to report at her office for a physical examination as to health and cleanliness by a physician employed for such purpose. The physician reported to the defendant the result of the examination, and she gave the inmate a certificate, either of health or for free entrance to a hospital for treatment if diseased or sick. The inmate of one of the houses of prostitution, No. 140, whom the state claimed and alleged was an inmate therein, and whom it is alleged the defendant, by promises, etc., caused and induced to remain therein as such inmate, voluntarily entered the house of prostitution occupied and conducted by one of the landladies, and there for hire voluntarily prostituted her person to divers men, some of whom had roomed at her mother's rooming house and with whom she was acquainted. She at will left the house in the morning and returned in the evening. The next day, she with other inmates, voluntarily reported to the defendant's office for an examination. There she met the defendant. It is not charged or claimed that the

defendant had anything to do in causing or inducing the inmate to enter the house of prostitution. Upon the record, it is conceded that the defendant did not know she was there until the inmate reported at the defendant's office for an examination, or that the defendant then knew that she was or had been such an inmate. From a conversation then had between the inmate and the defendant, and things said by the defendant thereafter, the "certain promises" of the defendant, which it is claimed induced the inmate to remain as such inmate, are deduced. We give them as testified to by the inmate herself, and on whose testimony alone the state relied to show the promises. On her direct examination she testified that she knew the defendant, but had not seen her since she was a child; that the defendant was also acquainted with her mother; that the defendant asked her how old she was, and that she told her between sixteen and seventeen; and that "I talked with her (the defendant) before and after I was examined. She asked me what my name was and I told her (first an assumed name and then her right name). She said, 'You ought to know me,' and I said 'Yes, ma'am; I do.' She said, 'Where have I seen you,' and I said, 'In Ogden' (where the inmate and her mother formerly lived). I asked her if I was not too young to be down there, and she said, 'No, you are just the right age.' She said I was a blonde and could make good money down there; that there were several calls for blondes. She said I could make good money, and I could get me some good clothes." Then, after testifying as to her examination, she further testified in response to a question if anything else was said, that "there was one thing I forgot, down at the preliminary hearing, she (defendant) said, 'I don't know why your mother should have any objections for you to do a little sporting when you have had one sister down here who has been doing sporting.'" She further testified that a night or two thereafter she saw the defendant in the dance hall and the defendant "told me to get in and hustle. I asked her if she would telephone to my mother, and she said, 'Yes.' Then she told me to get in and hustle." This is all that was testified to by her on her

direct examination relating to conversations had with, or things done by, the defendant. She testified to no additional things in that respect on her cross-examination. At the conclusion of her cross-examination a recess was had. Thereafter she was recalled for further direct examination. She was asked and answered: "Q. I understand you to say that it was on Tuesday morning that you were examined in No. 10? A. Yes, sir. Q. And is that the time that the statement was made to you, something about your clothing by" the defendant? "A. Yes, sir. Q. Why did you stay there after that? A. Because," the defendant "said that if my mother was willing to let me stay there she would fit me out with nice clothes and send me to Ogden. Q. Is that the reason you stayed? A. Yes, sir." On recross-examination she testified that during the recess the district attorney had talked to her and "just asked me about this question, and if I remembered that. That was something that I had forgot this morning and forgot at the preliminary examination. I was going to say it but forgot it. The district attorney asked me why I stayed there and I told him." On the recross-examination the witness several times testified that what the defendant said to her was "if your mother don't object I'll buy you a nice suit of clothes and send you to Ogden," or "if your mother don't object she would send me to Ogden and give me some clothes." Neither on her direct nor cross-examination did she testify that the defendant said to her that if she remained or stayed, or if her mother was willing to let her stay, the defendant would buy her clothes or do anything, but that if her mother did not object the defendant would buy or give her clothes and send her to Ogden.

This is all the evidence in the record on the part of the state bearing on the question of any promises having been made by the defendant, or of her causing, persuading, or inducing the inmate to remain an inmate of a house of prostitution, and is all in support thereof that is pointed to by the state. Putting it in the Attorney-General's own language, the defendant said to the inmate "that she was not too young to be in that business; that she was just the right age; that

she was a blonde, and that blondes took well. She told her to get in and hustle. She told her that she could make good money and could get some good clothes. She told her that she did not know why her mother should have any objection for her to do a little sporting when she had one sister down there (in the stockade), and in addition to this she further made the further promise that, "if her mother was willing to let her stay there (at the stockade), she would fit her out with nice clothes and send her to Ogden" (where the defendant was also interested in a "red light district"). These, and only these, are the "certain promises" claimed to have been made by the defendant and which caused, induced, and persuaded the inmate of a house of prostitution to remain therein as such inmate. Let them be looked at singly or collectively, and yet what reasonable certainty of a promise or promises is shown? What declaration or offer, either express or implied, made by the defendant and accepted or acted on by the inmate, to do or forbear some act or thing calculated, or having a natural tendency to cause, persuade, or encourage such an inmate to remain in the house of prostitution, or tending to show any causal connection between the claimed promises and the continuance of the inmate in the house of prostitution, or one designed to produce such a result and made for such purpose? Many of them cannot even be called any kind of a promise. The only thing approaching it is the reason given by the inmate why she remained; the claimed promise that the defendant would buy her clothes and send her to Ogden if "her mother," not the defendant, "was willing to let me stay." Giving this language the most liberal meaning, it is plainly seen that the promise to fit the inmate out with nice clothes and send her to Ogden was not conditioned on the defendant's wish or will that the inmate remain or stay, but on the wish or will of the mother, if she, not the defendant, "was willing to let me stay there" in the stockade. That but implies if her mother was willing she could stay, if she was not willing, the negative is equally implied, and thus the staying or remaining of the inmate was conditioned on the will of the mother, and not of the de-

fendant. But, when the inmate was asked what in fact the defendant said to her with respect to giving or buying her clothes, she each time testified, not that the defendant said that she would buy or give her clothes if she remained or stayed, or if her mother was willing for her to remain or stay, or that the defendant said or offered to do anything of that kind on any such conditions, but what the defendant in fact did say was, "If your mother don't object, I will buy or give you clothes and send you to Ogden."

It is not enough that the defendant made some kind of a promise to the inmate; it must also appear that the promise was made with the design or purpose of causing or inducing the inmate to remain in the alleged house of prostitution, and that it was one fairly calculated or naturally tending to produce such a result, and that the inmate in fact did so remain, not as evidenced by a state of mind expressed on the witness stand, but as evidenced by some act or conduct on her part, or by something said or done by her, showing, or tending to show, that she acted on, or was induced or influenced by, the promise, and by reason thereof remained in the house of prostitution. And while she was asked why she remained at the stockade, the very issue to be determined, she gave as a reason "because" the defendant "said that, if my mother was willing to let me stay there, she would fit me out with nice clothes and send me to Ogden," but, when asked what it was that the defendant said to her in that respect, she repeatedly answered that "I could make good money and I could get me some nice clothes," and "if your mother don't object I will buy or give you a nice suit of clothes and send you to Ogden." Nowhere does the record disclose that the defendant asked, requested, or invited the inmate to remain, or that the defendant did or said anything that if the inmate did remain the defendant would do anything for her, or give her anything, or that the defendant declared or offered to do or not to do anything whatever on condition or an understanding of any kind that the inmate remain. Nothing of that kind was testified to by the inmate or by any one else.

As testified to by the inmate, the day after she entered the house of prostitution she took the examination, on a Tuesday. ·On Wednesday or Thursday following she, according to her testimony, asked the defendant to telephone to her mother, who, in Salt Lake City, was conducting an uptown rooming house, and, according to the testimony of the defendant, the defendant telephoned the mother against the protest of the inmate. No matter about that, for the evidence shows beyond dispute, and as testified to by the mother herself, that the defendant did telephone the mother, who, in response to the message, visited the defendant's office at the stockade on the Friday following. The inmate was brought into her presence, and the mother, as testified to by her, said to her, "Why are you here? Aren't you ashamed of yourself?" The inmate, as testified to by herself, began to cry and said, "I couldn't help it," and that, upon her mother's stating that she would "whip me when she got me home," the defendant asked her not to do so, and said "if she had a daughter who went out that way she would take her back, because she was her own flesh and blood." After further conversations, in which the mother and the inmate did not remember what was said, the two left the stockade. No act or conduct on the part of the inmate, nor anything said or done by her during the time she was in the stockade and before she left it, is shown from which it may be inferred or implied that by reason of anything said or done by the defendant the inmate remained in the house of prostitution, or was caused, induced, or persuaded to do so. The evidence, without dispute, shows that the inmate during the time she was in the stockade at will and voluntarily left it each morning and returned in the evening to ply her calling. Thus, looking at the portion of the evidence most favorable to the state relating to the question in hand—the alleged promises—it is seen that the defective information is even in that particular also unsupported by evidence.

We have thus reviewed such matters, not from the standpoint of the defendant's evidence, but wholly from that of the state. Nor does the evidence of the defendant aid the

state in that regard, for she and other witnesses testified that the inmate, when she applied for the examination, gave an assumed name and stated her age to be between nineteen and twenty, and that the defendant did not then know her. A day or two after that the husband of the inmate's sister, and who was a piano player in one of the houses, informed the defendant who the inmate was and told her that the inmate was his wife's sister. Thereupon the defendant sent for the inmate and asked her her name. She declined at first to give it, but finally admitted who she was. The defendant then stated to her that she would telephone the inmate's mother, but the inmate protested and asked her not to do so. The defendant, however, on the following day telephoned the mother, who, in response to the message, came to the stockade and took the inmate with her.

There is other evidence relating to the inmate's conduct in entering the house of prostitution and becoming an inmate therein, but as it is not charged or claimed that she was, against her will, caused or induced to enter the house and to become such inmate, or that the defendant had anything to do in causing or inducing her to do so, we have not in detail referred to that. There is also much evidence to show the manner in which the unlawful and disreputable business was carried on in the stockade, the defendant's interest in, her connection with and supervision over it, and that she was an active and the principal factor in fostering and maintaining it. The evidence amply shows that the law in such particulars was violated, that the business ought to have been suppressed, and the defendant and all other offenders prosecuted and punished for such violations. But she was not charged with, nor tried for, or convicted of, that. There is also evidence to show that the defendant told one of the witnesses who also was charged with pandering "to lie like hell," and some to justify the inference that both the mother and the inmate were unwilling witnesses for the state, and that they, especially the mother, through collusion or otherwise with the defendant seemingly colored their testimony in the defendant's favor, and, in some particulars, attempted to shield her

and evaded answering direct questions put to them by the
district attorney.  While such conduct of the defendant and
the witnesses were matters affecting their credibility, the
weight of their testimony, and the merits of the defendant's
defense, yet they, in themselves, could not supply a want of
evidence of necessary affirmative facts.

And so, while we have not for these reasons in detail re-
ferred to all the evidence relating to the stockade, the dis-
reputable and unlawful business carried on therein, the de-
fendant's conduct with respect to it, nor the conduct of the
inmate in entering the house of prostitution and be-
coming an inmate, yet we have in detail referred to     **8**
all the evidence in any manner relating to a promise
or promises made by the defendant to the inmate and to all
that was said or done by the defendant and the inmate in
respect of that question, the only thing claimed by the state
on the evidence by which the inmate was caused or induced
by the defendant to remain an inmate in a house of prostitu-
tion.

Even though the evidence should support a good informa-
tion, yet, for the reasons already stated, the prosecution must
fail because of the fatally defective information; such a de-
fect being incurable by evidence or verdict.  An informa-
tion or indictment when assailed as to substance must stand
or fall by its own structure.  It is not a technical, but a
sound and fundamental, rule in the law of criminal pro-
cedure that the accused be apprised, not by the evidence ad-
duced, but, at the outset, by the indictment or information,
with reasonable certainty of the exact nature of the accusa-
tion against him.  This rule cannot be bent to meet exigencies
of a particular case, nor the class or grade of the person
accused.  The Constitution and the statute prescribe the rules
by which the sufficiency of an information may be deter-
mined, and they apply to all alike.  They do not prescribe
one rule for a keeper or director of a house of prostitution
and another for a nun, nor one rule for one offense and
another for another offense.

The conclusion reached holding the information defective in the particulars stated not only works a reversal of the judgment but a discharge of the defendant. We have a statute (C. L. 1907, section 4694) which provides that "an information may be amended in matter of substance or form at any time before the defendant pleads, without leave of court. The information may be amended at any time thereafter and on the trial as to all matters of form, at the discretion of the court, where the same can be done without prejudice to the rights of the defendant." An amendment supplying proper allegations and curing the defects of this information is matter of substance, not form. The particular defects were, before plea, specifically pointed out by the special demurrer. The undoubted right to amend the information in respect to the particulars wherein it is defective then existed. Instead of amending it, when an amendment was permissible, the hazard of a trial and a conviction on a bad information was taken. The right to now amend is lost. The statute, whether wisely or unwisely, forbids it.

The order therefore is that the judgment of the court below be reversed, and the case remanded to the district court, with directions to discharge the defendant.

FRICK, C. J., and McCARTY, J., concur.